Timothy Wesley McCORQUODALE,
Petitioner-Appellant,

v.

Charles BALKCOM, Warden, Georgia
State Prison, et al.,
Respondents-Appellees.

No. 82–8011.

United States Court of Appeals,
Eleventh Circuit.

Dec. 30, 1983.

John R. Myer, Atlanta, Ga., John Charles Boger, Anthony Amsterdam, New York City, for petitioner-appellant.

Lewis R. Slaton, H. Allen Moye, Janice G. Hildenbrand, Mary Beth Westmoreland, Asst. Attys. Gen., Atlanta, Ga., for respondents-appellees.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

KRAVITCH, Circuit Judge:

The petitioner, Timothy Wesley McCorquodale, was convicted by a jury of first degree murder and sentenced to death.[1] The Georgia Supreme Court affirmed the conviction and sentence on direct appeal, *McCorquodale v. State*, 233 Ga. 369, 211 S.E.2d 577 (1974), and the United States Supreme Court denied a petition for writ of certiorari. *McCorquodale v. Georgia*, 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218 (1976).

---

1. The facts and circumstances of the homicide are summarized in the Georgia Supreme Court's opinion, *McCorquodale v. State*, 233 Ga. 369, 211 S.E.2d 577 (1974). The Georgia court upon completing review of the case observed that, "In no case we have reviewed has the depravity of the defendant and the torture of the victim exceeded that established by the evidence and testimony of the witnesses in this case." We will limit our recitation of the facts to those relevant to the issues raised on appeal.

The petitioner subsequently filed a petition for a writ of habeas corpus in state court, which was denied, *McCorquodale v. Stynchcombe,* 239 Ga. 138, 236 S.E.2d 486 (1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 534, 53 L. Ed.2d 467 (1977). McCorquodale then filed an extraordinary motion for a new trial based upon newly discovered evidence, which, after an evidentiary hearing, was also denied, and the denial was affirmed on appeal. *McCorquodale v. State,* 242 Ga. 507, 249 S.E.2d 211 (1978).

After his failure to obtain relief in the state courts, McCorquodale brought the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Georgia. He raised six contentions in support of his petition, attacking both his conviction and his sentence. The district court found all of the arguments to be without merit and denied habeas corpus relief. *McCorquodale v. Balkcom,* 525 F.Supp. 408 (N.D.Ga.1981). A panel of this court affirmed the denial of relief as to five of McCorquodale's arguments, but reversed as to his sentence, directing that the writ of habeas corpus issue because the petitioner's constitutional right to a fair and impartial jury under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), had been violated. *McCorquodale v. Balkcom,* 705 F.2d 1553 (11th Cir.1983). This court elected to hear the case en banc, and we now hold that the district court properly denied the writ in concluding that the voir dire procedures comported with *Witherspoon* standards.

### I. *The Witherspoon Rule*

The Supreme Court in *Witherspoon v. Illinois* enunciated the rule that:

a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

391 U.S. at 522, 88 S.Ct. at 1777 (footnotes omitted). The Court clarified in a footnote the two reasons why a juror could be excused for cause in the *Witherspoon* context:

We repeat, however, that nothing we say today bears upon the power of a state to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made it unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in original). *Witherspoon's* holding thus struck a balance between "the state's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths," *Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), and a defendant's right to have a neutral jury not "uncommonly willing to condemn a man to die." *Witherspoon,* 391 U.S. at 521, 88 S.Ct. at 1776; *see also Adams,* 448 U.S. at 44, 100 S.Ct. at 2526.

The petitioner advances three arguments as to why the voir dire proceedings in his case violated *Witherspoon's* standards: (1) the collective questioning of the venirepersons and their non-verbal responses failed to ensure that each individual juror would unequivocally refuse to impose the death penalty or impartially deliberate on the defendant's guilt; (2) the *Witherspoon* questions asked at voir dire were insufficient; and (3) the questions asked to and the responses by two of the jurors dismissed for cause, jurors Woodlief and Kidd, were insufficient.

### II. *Group Questioning and Non-Verbal Responses*

■ At voir dire the prosecutor collectively asked a series of three questions to the approximately sixty jurors comprising the jury pool. The prosecutor first asked:

Are you conscientiously opposed to capital punishment? If you're conscientiously opposed to capital punishment, if you will, please stand. If you are not conscientiously opposed to capital punishment, remain seated.

Nineteen jurors stood up in response to this question.

The prosecutor then posed the two additional questions required by *Witherspoon* to those jurors who had stood up, asking them to step forward if they would answer the question affirmatively:

The first question is this. Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case, regardless of what the evidence was?

. . . .

The [second] question is this. Would you allow your opinion about capital punishment to prevent you from being a fair and impartial juror on the issue of guilt or innocence as distinguished from the issue of punishment? If you would, would you please step forward.

The prosecutor then moved the court to dismiss the fifteen jurors who had stepped forward. The court granted the motion over defense counsel's general objection.

The manner in which voir dire was conducted in this case raises two questions of first impression:[2] whether *Witherspoon* requires individual questioning of prospective jurors and whether their responses must be verbal. Necessarily involved in answering the last question is another issue which has yet to be resolved in the *Witherspoon* context:[3] what degree of deference, if any, should be granted to a trial court's assessment of whether a juror's responses are "unmistakably clear" so as to satisfy *Witherspoon*.

We hold that group questioning and nonverbal responses do not constitute a per se violation of *Witherspoon*. *Witherspoon* governs the *substance* of the inquiry to be made, not its *form,* and only requires that the voir dire method used for questioning and receiving responses allows a court to determine *in the particular case at hand* that the excluded venirepersons "made unmistakably clear" that their attitude toward the death penalty would either automatically cause them to vote against the death penalty or prevent them from impartially deciding the defendant's guilt.

In this case, posing the *Witherspoon* questions to the jury pool as a group did not prevent the trial court from making this necessary determination. The questions asked by the prosecution went immediately to the relevant *Witherspoon* inquiries and carefully tracked the wording in *Witherspoon*.[4] Furthermore, the responses to be

---

**2.** *Cf. Goodwin v. Balkcom,* 684 F.2d 794, 816 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983) ("Depending upon the comprehensiveness of the [*Witherspoon* ] questions addressed to a potential juror, it may be possible in some instances for a court to decide that a response other than verbal is unquestionably unambiguous. We leave that question for another case. . . .").

**3.** *See* discussion in *O'Bryan v. Estelle,* 714 F.2d 365, 371–73 (5th Cir.1983).

**4.** Questions that have been held inadequate for gauging the unequivocality of a juror's response are those that have inquired only as to the "conscientious scruples" of the juror or asked whether the death penalty might "affect" his deliberations, without making the ultimate inquiry of whether the juror's views are so strong that they would preclude him from following his oath. *See, Adams v. Texas,* 448 U.S. at 49, 100 S.Ct. at 2528, (questions as to whether possibility of death penalty would "affect" juror's deliberations); *Segura v. Patterson,* 403 U.S. 946, 91 S.Ct. 2280, 29 L.Ed.2d 856 (1971), *rev'g without opinion,* 402 F.2d 249 (10th Cir. 1971); *Boulden v. Holman,* 394 U.S. 478, 483–84, 89 S.Ct. 1138, 1141–42, 22 L.Ed.2d 433 (1969) (COURT: "Do you have a fixed opinion against capital punishment?"); *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (jurors asked whether they had "conscientious scruples" against death penalty); *Witt v. Wainwright,* 714 F.2d 1069 (11th Cir.1983) (question as to whether death penalty would "interfere" with juror's deliberations); *Granviel v. Estelle,* 655 F.2d 673, 677 (5th Cir.1981) (QUESTION: "You just don't feel like you would be entitled to take another person's life . . .?"); *Burns v. Estelle,* 626 F.2d 396 (5th Cir.1980) (en banc) (question as to whether death penalty would "affect" juror's deliberations).

The questions asked in this case did not contain ambiguous language that would render

made by those venirepersons responding affirmatively to the questions—standing up in answer to the first question and stepping forward as to the next two questions—were clearly stated to the jurors and were not susceptible to misunderstanding.

The petitioner argues, however, that the group questioning was an "all or nothing" affair, and that individual questioning may have revealed that certain jurors were equivocating in their attitudes. This argument is without merit for several reasons.

■ First, nothing in the record indicates that the venirepersons were prevented from indicating that they did not understand the questions or from asking for clarification. Second, the court did not prevent defense counsel from asking further questions or requesting individual questioning of venirepersons; defense counsel entered only gen-

eral objections without specifying the precise nature of his objection. Once the state clearly establishes a potential juror's unequivocal opposition to the death penalty, which in this case the questions asked and the jurors' responses accomplished, it is then incumbent upon the defendant to make an objection specifying why the juror should not be dismissed and to request further questions that would clarify any perceived ambiguity or equivocating by the juror.[5] *Cf. Goodwin v. Balkcom,* 684 F.2d at 816 (defense counsel's failure to raise *Witherspoon* violation is evidence of ineffectiveness); *Burns v. Estelle,* 626 F.2d 396, 398 (5th Cir.1980) (en banc)[6] (error to deny defense counsel's request for further questioning). *See also, O'Bryan v. Estelle,* 714 F.2d at 378; *Porter v. Estelle,* 709 F.2d 944 (5th Cir.1983). Third, the *Witherspoon* questions were strongly and clearly worded

them invalid under the above line of cases. The petitioner argues that the use of the word "prevent" in the questions was ambiguous. We note, however, that the word "prevent" was a word chosen by the *Witherspoon* Court to be used in the second question to be asked. 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. Furthermore, as "prevent" is used within the context of the questions posed, it conveys the proper meaning that the juror must find that he *could not* impose the death penalty or deliberate impartially on the defendant's guilt.

**5.** The dissent states that Georgia law, OCGA 15–12–164, prohibits defense counsel from individually questioning prospective jurors after the statutory *Witherspoon* question is asked pursuant to OCGA 15–12–164(a)(4), because, if the juror's answer is affirmative, he is automatically excused for cause. *Infra,* dissent at 1504–1505, citing *Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386, 390 (1976) and *Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224, 234 (1981).

*Jordan* and *Arnold,* however, stand only for the proposition that *general* individual voir dire (preliminary to peremptory challenges) is not allowed at the OCGA 15–12–164 voir dire stage (excusal for cause). The statute does not forbid additional questioning based upon answers to the statutory questions, and the case law interpreting the statute holds that although additional examination is not a matter of right, the trial judge has the discretion to allow further inquiry. *Ford v. State,* 202 Ga. 599, 44 S.E.2d 263, 265 (1947) (interpreting GA.CODE 59–806, predecessor of OCGA 15–12–164); *Hall v. State,* 64 Ga.App. 644, 13 S.E.2d 868, 869 (1941) (scope of inquiry based on statutory questions concerning juror's competency with-

in judge's discretion). *See also Goodwin v. Balkcom,* 684 F.2d at 816 (defense counsel in Georgia capital case erred because he could have, but did not, question a juror that judge erroneously concluded had stated she was unequivocally opposed to the death penalty).

Furthermore, a view of Georgia cases reveals that defense counsel frequently participate in the *Witherspoon* questioning of jurors. See *Mincey v. State,* 251 Ga. 255, 304 S.E.2d 882, 889–90 (1983); *Castell v. State,* 250 Ga. 776, 301 S.E.2d 234, 244–46 (1983); *Allen v. State,* 248 Ga. 676, 286 S.E.2d 3 (1982); *Cofield v. State,* 247 Ga. 98, 274 S.E.2d 530, 535–36 (1981) (defense counsel's further questioning of juror on *Witherspoon* issue allowed, but not questions outside scope of *Witherspoon's* holding). *Cf. Mincey, supra* 304 S.E.2d at 890 (defense counsel allowed to question juror further as to OCGA 15–12–164 question concerning juror's ability to be fair and impartial). Thus, although defense counsel does not have an absolute right under Georgia law to ask or request questions beyond the basic *Witherspoon* inquiry of OCGA 15–12–164, if defense counsel makes a nonfrivolous, specific objection to the dismissal of a juror because of ambiguity, and his request for further questioning is denied, such denial would fall within the ambit of *Burns, supra,* as the reviewing court would have to speculate about the juror's response to a crucial question.

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit decided prior to October 1, 1981.

so as to evoke an affirmative answer only from those jurors with unequivocating beliefs. In this sense, the petitioner's "all or nothing" argument would actually work in his favor—initially equivocating jurors who might on further questioning answer the *Witherspoon* questions "yes" would remain seated, and only those jurors who could answer the questions "yes" without hesitation would stand. Finally, even where individual questioning is conducted, a juror must eventually make the "all or nothing" decision of answering the *Witherspoon* questions "yes" or "no."[7] As used in this case, therefore, group questioning complied with *Witherspoon*'s directive.[8]

The analysis of group voir dire developed above equally applies to the adequacy of the non-verbal responses. The relevant inquiry is whether the non-verbal responses served *in this case* to make "unmistakably clear" the excused jurors' unequivocal opposition to the death penalty or their inability to impartially decide the defendant's guilt. *Witherspoon v. Illinois,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

In assessing the adequacy of a venireperson's response to *Witherspoon* questions, a reviewing court must grant some deference to the trial court's assessment of the juror's demeanor and clarity of his answer. Whether verbal or non-verbal, a response once reduced to a written record may not adequately convey the strength of the juror's response. Even a simple "yes," although on a cold record appearing crystal clear, can be delivered in a manner that conveys doubt. *Witherspoon* requires a reviewing court to independently review the record to ensure that the exclusions were proper, but that review must take into account that the trial judge was in a much better position to evaluate the clarity of a juror's response. *See O'Bryan v. Estelle,* 714 F.2d at 395 (Higginbotham, J., concurring).

The juror's responses in this case were unambiguous acts which were sufficient to make "unmistakably clear" their answers to the *Witherspoon* questions. Potential jurors were asked to stand up if conscientiously opposed to the death penalty and to step forward if either unequivocally opposed to the death penalty or if their views would prevent impartial deliberation of the defendant's guilt. The trial court was able to observe the jurors' responses and demeanor for hesitancy or uncertainty that would have indicated that their responses were not "unmistakably clear." Moreover, defense counsel did not bring to the court's attention any jurors responding to the question who appeared to be equivocating, which further indicates that the voir dire was satisfactory. On the basis of these facts, we cannot find that the non-verbal responses failed to satisfy *Witherspoon's* "unmistakably clear" standard.

Non-verbal responses and group voir dire are not necessarily the preferred method for voir dire in the *Witherspoon* context. Individual voir dire and verbal responses may very well be less susceptible to error.[9]

---

7. *See, e.g.,* the exchange between the trial judge and juror Pfeffer in *O'Bryan v. Estelle,* 714 F.2d at 378–81.

8. The panel opinion discussed a line of pre-trial publicity cases in deciding whether individual voir dire is required in the *Witherspoon* context. *McCorquodale v. Balkcom,* 705 F.2d at 1558–59, 1563–64. To the extent that these cases are relevant, they fail to support petitioner's position. They commit the method of voir dire examination to the trial court's discretion within the limits of due process, including whether voir dire should be conducted collectively or individually. *United States v. Gerald,* 624 F.2d 1291, 1296 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). The key factors to be examined are

whether the court utilized an effective means of eliciting answers, *United States v. Davis,* 583 F.2d 190, 196–98 (5th Cir.1978), whether the crucial questions were asked, *id.* at 197–98, and whether the defendant failed to specifically object to the voir dire method or request individual questioning. *United States v. Gerald,* 624 F.2d at 1297–98. As our earlier discussion makes evident, we find all these factors to be satisfied in this case.

9. Verbal responses do not of course guarantee that an answer will be unmistakably clear. The clarity of a verbal response may turn on the individual's tone or expression. Likewise, certain non-verbal responses may be more susceptible to ambiguity than others. A nod of the

*Witherspoon,* however, does not require that any one form of voir dire be used or that a juror's philosophical reasons for opposing the death penalty be explored. Instead, it only requires that the method employed and the questions asked evoked·non-ambiguous answers that satisfied the *Witherspoon* "unmistakably clear" standard. Applying that principle to this case, we find that the method of voir dire used here satisfied *Witherspoon's* mandate.

### III. *Sufficiency of the Witherspoon Questions*

■ The petitioner raises two specific challenges to the sufficiency of the *Witherspoon* questions asked at voir dire. His first argument focuses on the language of the question:

> Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case, regardless of what the evidence was?

He argues that the inclusion of the phrase "in this case" violates *Witherspoon's* admonishment that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. Defense counsel had objected generally to the question, without specifying this argument as the basis of his objection.

The argument ignores the clear import of the voir dire question. The phrase "in this case" was not intended to refer specifically to the petitioner's case, and a reasonable juror would not have interpreted the phrase as asking him in advance if he "would in fact" vote for the death penalty in the petitioner's case.[10] Rather, the phrase was used in the same sense that the *Witherspoon* Court used the phrase "in the case before him" in explaining that venirepersons could be excused only if they would not impose the death penalty "without regard to any evidence that might be devel-

oped at the trial of *the case before them.* . . ." *Witherspoon v. Illinois,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. (emphasis added).

■ Petitioner next urges that in addition to the two *Witherspoon* questions that were actually posed, a third question should have been asked as to whether a juror could subordinate his views to his oath as a juror to obey the law. Petitioner relies on footnote seven in *Witherspoon* for this proposition:

> It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as juror and to obey the law of the state.

391 U.S. at 514 n. 7, 88 S.Ct. at 1773 n. 7. Petitioner would thus have us add a third prong to the two-prong test outlined in footnote twenty-one of *Witherspoon.*

This court has already rejected petitioner's argument on one prior occasion:

> Nowhere in . . . footnote [7], or in any other part of the opinion, does the Court even imply that a trial court must give the instructions suggested by the petitioner, and we decline to so hold.

*Spinkellink v. Wainwright,* 578 F.2d 582, 593 n. 14 (5th Cir.1978). We adhere to *Spinkellink's* holding as the proper result in light of *Witherspoon's* purpose and reasoning. Footnote seven in *Witherspoon* merely explained the rationale behind the opinion, that potential jurors cannot be excluded for their views on the death penalty unless it would prevent them from following their oaths as jurors. This concern is more than adequately covered by the two questions asked in voir dire based upon footnote twenty-one of the *Witherspoon* opinion. The very principle underlying the questions asking jurors whether their views on the

---

head, for example, is more susceptible to misinterpretation than requiring a person to stand up or step forward.

**10.** The *Witherspoon* court noted that "[t]he critical question, of course, is not how the phrase

is employed in this area or been construed by the courts and commentators. What matters is how they might be understood or misunderstood—by prospective jurors." 391 U.S. at 515 n. 9, 88 S.Ct. at 1773 n. 9.

death penalty would cause them to automatically vote against the death penalty or preclude them from deliberating impartially on the defendant's guilt is to discern whether the jurors would follow their oaths. The petitioner's proposed third question, therefore, is already subsumed under the two questions that were asked.

### IV. *Jurors Woodlief and Kidd*

After the group voir dire, the prosecutor conducted individual questioning of the remaining jurors, which resulted in jurors Woodlief and Kidd being excused for cause. Petitioner challenges these excusals on *Witherspoon* grounds.

The excusal of Woodlief was based on the following exchange:

Q: Do you really believe in capital punishment?

A: No.

Q: You don't?

A: No, I don't. It's different being faced, you know, discussing capital punishment and sending someone to the electric chair.

THE COURT: You didn't understand the question that was posed to you a while ago?

THE JUROR: Yes, I did at that time. I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't.

THE COURT: All right, Mr. Ridley. That's grounds for excusal for cause. You may be excused.

MR. RIDLEY: Your honor, may I invoke the same objections as to the others?

THE COURT: Yes. You may be excused.

Focusing on Woodlief's use of the word "think," the petitioner argues that Woodlief's excusal for cause was improper because she did not unequivocally state that she could not impose the death penalty.

■ A review of a *Witherspoon* excusal necessitates an examination of the "totality of the circumstances of the voir dire" because *Witherspoon* "does not require that the venire person utter a pat phrase . . . ." *Witt v. Wainwright,* 714 F.2d 1069, 1083 (11th Cir.1983). Moreover, the fact that a juror initially stated that he could follow his oath and then later changed his mind does not demonstrate that a *Witherspoon* violation has occurred. It is the juror's ultimate conclusion by which the court judges whether the juror is unequivocally opposed to the death penalty. *See Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983); *O'Bryan v. Estelle,* 714 F.2d at 381–82.

■ Analyzed from the foregoing prospective, we find that too much is made of Woodlief's use of the word "think." Placed within the context of her *entire* voir dire, her response, "I don't think I could do it, *I really don't,*" is unambiguous and unequivocal.

Woodlief stated that she had understood the *Witherspoon* questions[11] and proceeded to explain that upon further thought she realized that:

> It's different being faced, you know, discussing capital punishment and sending someone to the electric chair . . . .
>
> I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't.

This narrative evidences an individual who understood the questions asked, reflected upon them, and concluded that she could not impose the death penalty. Her statements, coupled with the trial judge's ability to observe Woodlief's tone of voice and

---

11. Juror Woodlief, therefore, does not pose the same problems that were addressed by the court in *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870, 875 (1982). In *Granviel,* the questions that were posed were ambiguous and the venireperson in answering indicated confusion and lack of understanding. In contrast, the questions here, as noted above, were clear and precisely stated. Woodlief stated that she understood the questions, and her answers indicate that she did indeed understand what was being asked of her.

demeanor for indecisiveness, allows only one reasonable interpretation of Woodlief's repetitive statement, "I don't think I could do it, I really don't": she unequivocally believed that she could not impose the death penalty regardless of the evidence presented.

Woodlief's voir dire, therefore, does not fall within the ambit of those cases holding a juror's response inadequate under *Witherspoon.* In those cases, the juror's response was insufficient either in light of the ambiguity of the questions asked [12] or because the reply itself indicated confusion or ambiguity that was not clarified by the voir dire.[13] In contrast, Woodlief was responding to properly stated *Witherspoon* questions and undertook an explanation that allows us to interpret the meaning of her answer without having to engage in speculation as to what her replies would have been if further questions had been propounded. *Compare Burns v. Estelle,* 592 F.2d 1297, 1301 (5th Cir.1979), *aff'd* 626 F.2d 396 (en banc).

In retrospect, the trial judge ideally would have repeated the *Witherspoon* questions to Woodlief, but the court's failure to conduct a perfect voir dire does not prevent us from finding that, based upon all the circumstances, Woodlief understood the questions previously asked and had come to an unequivocal decision that she could not impose the death penalty.

■ We conclude likewise, based upon a review of the totality of the circumstances, that juror Kidd was not improperly excused. Kidd's voir dire consisted of the following:

Q: Do you really believe in capital punishment?

A: To a certain extent.

Q: To a certain extent?

A: Yes, sir.

Q: Do you feel there are cases where under the evidence it would be a right and just verdict?

A: Well, in a way.

Q: Well, when it comes down, like the last lady [Ms. Woodlief] said, from a theoretical point to where a juror would be asked to vote, do you think you could really never vote for the death penalty no matter what the evidence was?

A: No, sir.

Q: You don't think you could?

MR. ENGLAND: If your honor please, I believe it [sic] should be excused for cause.

THE COURT: You say you never could vote for it regardless of the circumstances?

THE JUROR: No, sir.

THE COURT: Did you hear the question that was posed to you just a while ago? Did you understand the question?

THE JUROR: No, I did not understand.

THE COURT: You could not under any circumstances vote for the death penalty?

THE JUROR: No.

THE COURT: Is that right, under any circumstances?

THE JUROR: No.

THE COURT: In that case, you may be excused.

MR. RIDLEY: May the same objections be noted?

THE COURT: Yes.

Although Kidd stated that he did not initially understand the questions asked at group voir dire, he was asked four times during individual voir dire if he could vote

---

**12.** *See* cases discussed *supra* note 4.

**13.** For example, in *Boulden v. Holman,* 394 U.S. 478, 483, 89 S.Ct. 1138, 1141, 22 L.Ed.2d 433 (1969), several jurors had been excused for simply stating they did not "believe" in capital punishment without stating that they could not themselves impose it. Similarly, in *Hance v. Zant,* 696 F.2d 940, 954–56 (11th Cir.1983), one juror was excused based on replies such as

"As I said before, I believe there are circumstances where the death penalty is warranted, I do not believe that I could vote for it." The excused juror was thus giving contradictory answers indicating confusion, but neither the trial court nor counsel clarified the juror's position. Ambiguous or confusing answers are, of course, often due to inadequate *Witherspoon* questions. *See supra* notes 4 & 10.

for the death penalty under any circumstances,[14] and each time he answered "No." Any initial misunderstanding or uncertainty on Kidd's part was thus resolved by the subsequent questions asked of him and the unequivocality of his responses. Furthermore, defense counsel once again entered only a general objection, without requesting that any further questions be asked. Considering Kidd's ultimate conclusion that he could not impose the death penalty under any circumstances, *see Williams v. Maggio,* 679 F.2d at 386; *O'Bryan v. Estelle,* 714 F.2d at 381–82, we conclude that his excusal did not violate *Witherspoon's* standards.

### V. *Conclusion*

The district court correctly concluded in denying the writ of habeas corpus that neither the method of voir dire, the questions asked, nor the exclusion of jurors Woodlief and Kidd violated *Witherspoon.* The district court also properly denied the writ as to the five additional contentions that McCorquodale raised in his petition: "(1) That his written statement was improperly admitted because (a) his arrest was unlawful and (b) his statement was involuntary; (2) that the trial court's instruction on intent operated unlawfully to shift the burden of proof from the state to the defendant; (3) that the jury which tried his guilt or innocence was prosecution-prone; (4) that he was erroneously denied a full evidentiary hearing on his claims that the Georgia capital punishment statute is applied in an arbitrary and racially discriminatory fashion; (5) that the district attorney's remark to the sentencing jury regarding appellate review violated petitioner's due process right to a fundamentally fair trial...." *McCorquodale v. Balkcom,*

705 F.2d at 1555. The panel opinion affirmed the district court's denial of the writ as to these contentions, which we likewise affirm, reinstating those portions of the panel's holding not inconsistent with this opinion.

The district court's denial of the petition for habeas corpus is AFFIRMED.

CLARK, Circuit Judge, with whom HATCHETT, Circuit Judge, joins, dissenting:

### Part I: Group Questioning

In *Witherspoon v. Illinois,* 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776, 784 (1968), the Supreme Court announced the principle that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." To that end, the Court held that a venireperson's opposition to capital punishment will not justify his excusal for cause, unless he "states unambiguously" and thereby renders it "unmistakably clear" that he would "automatically vote against the imposition of capital punishment no matter what the trial might reveal." *Id.* at 515–16, 522, 88 S.Ct. at 1773–74, 1777, 20 L.Ed.2d at 781–82, 785.

As a general matter, unmistakable clarity is no mean feat to obtain in communications between a judge and juror; it requires that the juror understand the questions asked, and that the judge understand the answers given.[1] Such clarity is doubly elusive in the *Witherspoon* context, where the juror must communicate not only his opinion as to whether he opposes capital punishment, but also the strength and nature [2] of that opin-

---

**14.** The voir dire of Mr. Kidd demonstrates the problems when questions are posed in the negative. Although examined out of context, Kidd's "no" answers to a negative question arguably might indicate that he actually could impose the death penalty, a review of the entire exchange between the court and Kidd demonstrates that he was actually stating that he could not vote for the death penalty under any circumstances. This conclusion is further evidenced by the fact that neither the trial judge nor counsel indicated that they understood Mr.

Kidd to be saying that he could impose the death penalty.

**1.** Determination of whether a juror should be excused for cause is a mixed question of fact and law and is left to the trial judge. *See Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961).

**2.** Whether a juror is capable of setting aside his opinion, thereby preserving his impartiality, would appear to turn upon the strength of his

ion, for "even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon,* 391 U.S. at 514, 88 S.Ct. at 1773, 20 L.Ed.2d at 781 n. 7.

The central issue here is whether the procedures employed by the trial court elicited sufficient information to make it unmistakably clear to the trial judge that the jurors excused for cause were unable to set aside their opposition to the death penalty. The majority of this court is satisfied that fifteen jurors standing mute in the face of two questions fulfills this requirement and justifies the jurors' exclusion. The objective of the *Witherspoon* inquiry, however, is not to furnish a vehicle for the exclusion of jurors, but on the contrary is to *insure against* the exclusion of qualified objectors to the death penalty. This was made clear in *Adams v. Texas:*

> As an initial matter, it is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the state's power to exclude; if prospective jurors are barred from jury service because of their views about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death penalty cannot be carried out.

*Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). I cannot agree with the majority opinion, because it authorizes the exclusion of prospective jurors from jury service on a broader basis than permitted by *Adams v. Texas* and *Witherspoon.*

In this case, nineteen jurors indicated that they were conscientiously opposed to capital punishment; the nineteen were then addressed en masse by the district attorney,[3] who requested that those venirepersons, whose opposition to capital punishment would prevent them from being impartial as to guilt or from voting for the death penalty regardless of the evidence, step forward. The fifteen who did were excused for cause over objection and without further questions. In assessing whether those fifteen jurors were properly excused, it is "the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751, 756 (1961).

The first matter that must be considered in light of the trial procedures employed is whether the jurors may have misunderstood the questions asked of them. As *Witherspoon* emphasized, "The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors." 391 U.S. at 515–16, 88 S.Ct. at 1773–74, 20 L.Ed.2d at 781–82 n. 9 (1968). The majority here concludes that the questions "were clearly stated to the jurors and were not susceptible to misunderstanding." Such a conclusion is directly contradicted by the testimony of venirepersons Kidd and Woodlief, quoted by the majority later in the opinion. Kidd and Wood-

---

opinion. Chief Justice Marshall, in the *Aaron Burr* case, observed that:

> [L]ight impressions which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him.

... The question must always depend on the strength and nature of the opinion which has been formed.

*United States v. Burr,* 25 Fed.Cas. 49, 51 (1807).

**3.** Georgia law provides that the "usual voir dire questions," which include inquiries concerning the jurors' attitudes toward capital punishment, be "put by the court." O.C.G.A. 15–12–133, 164; *Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224 (1981). The court may, however, delegate that responsibility to the district attorney. *Hicks v. State,* 232 Ga. 393, 207 S.E.2d 30 (1974).

lief did not indicate, when questioned en masse along with the rest of the venire, that they would be unable to vote for the death penalty regardless of the evidence. They and the other remaining jurors were then questioned individually:

The Court: You say you never could vote for it regardless of the circumstances?

Juror Kidd: No, Sir.

The Court: Did you hear the question that was posed to you just awhile ago? Did you understand the question?

Juror Kidd: *No, I did not understand.*

\*    \*    \*    \*    \*    \*

Q. Do you really believe in capital punishment?

Juror Woodlief: No.

\*    \*    \*    \*    \*    \*

The Court: You didn't understand the question that was posed to you awhile ago?

Juror Woodlief: *Yes, I did at that time. I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't.*

Jurors Kidd and Woodlief either did not understand or come fully to terms with the *Witherspoon* questions when posed to the jurors en masse. Kidd and Woodlief resolved their confusion in favor of not stepping forward and were excused after individual questioning. But what of those venirepersons who may have been equally confused but nevertheless who stepped forward? They were dismissed without further interrogation; consequently, there is no way of telling how many of such persons there were, or from among such persons how many ought not to have been excused under *Witherspoon.*

The majority suggests first that members of the venire were free to ask for clarification if they did not understand the questions posed to them en masse. Such an assertion presupposes that jurors have no qualms about standing alongside eighteen of their peers and volunteering information

to the effect that they do not know what is going on. To so conclude is to ignore a vast body of research demonstrating the reluctance of individuals to single out their perceptions and attitudes as different from those of the group.[4]

Second, the majority indicates that after the fifteen venirepersons had stepped forward in response to the prosecutor's questions, it was incumbent upon the defense to rehabilitate those jurors through questioning. But Georgia law does not permit such questioning at that stage in the proceedings. O.C.G.A. 15–12–133 provides in part:

In all criminal cases both the state and the defendant shall have the right to an individual examination of each juror from which the jury is to be selected prior to interposing a challenge. The examination shall be conducted . . . in criminal cases *after the usual voir dire questions have been put by the court.*

(emphasis added). The "usual voir dire questions" refers to those questions enumerated in O.C.G.A. 15–12–164 (*Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224, 234 (1981)), which provides:

(a) On voir dire examination in a felony trial, the jurors shall be asked the following questions:

\*    \*    \*    \*    \*    \*

(4) "Are you conscientiously opposed to capital punishment?" If the juror answers this question in the negative, he shall be held to be a competent juror.

\*    \*    \*    \*    \*    \*

(c) If a juror answers any of the questions set out in subsection (a) of this Code section so as to render him incompetent or *if he is found to be so by the judge, he shall be set aside for cause.*

(emphasis added). Thus, McCorquodale's opportunity to question prospective jurors individually did not begin until *after* the trial court had put the statutory voir dire questions to the jury as a panel, including

---

4. *See* D. Suggs, B. Sales, "Juror Self-Disclosure in the Voir Dire: A Social Science Analysis,"

56 Ind.L.J. 245, 260 (1981); National Jury Project, *Jurywork* (2d ed.) 2–7 (1983).

question (4) pertaining to attitudes toward capital punishment, and *after* the judge had excused those jurors found to be incompetent in light of their answers to those questions. *Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386, 390 (1976).[5]

Third, the majority insists that the *Witherspoon* questions were worded so strongly and clearly that they would evoke an affirmative answer only from jurors whose beliefs were unequivocal. This, of course, presumes that the questions could not have been misunderstood, which, as noted earlier, is not the case. That the questions asked seem clear enough to a lawyer or judge well versed in the *Witherspoon* issue, does not

necessarily make them so to the average juror. It is likely that the average veniremember will have formed an opinion as to whether he is philosophically in favor of or opposed to capital punishment, and to the extent he has an opinion, he probably knows whether it is relatively strong or weak. Yet until the moment the question is asked, what cause would an ordinary juror have to consider whether he can set his opinion aside? It is improbable that a lay person will have had prior occasion to undertake the novel mental exercise of pitting the strength of his opposition to capital punishment against his desire to obey the law and abide by his oath as a juror.

---

**5.** The record reflects that the trial judge suggested that "we start off with 60" and then "the voir dire oath was administered to all panels by the District Attorney." (R. 1201–2). With this large group in the courtroom, the District Attorney undertook the interrogation of the entire group by asking questions required by O.C.G.A. § 15–12–164—"Questions on voir dire; setting aside juror for cause." Some jurors were excused for possible bias because of knowledge about the case. Then the District Attorney asked the *Witherspoon* questions which are the subject of this dispute.

On the basis of their responses to the *Witherspoon* inquiry and the other statutory voir dire questions, the trial court, pursuant to § 15–12–164(c), excused those jurors deemed incompetent. Fifteen jurors were so excused. The remaining jurors were then "put upon the accused" as directed by § 15–12–161, at which time, the right to individual examination commenced pursuant to O.C.G.A. § 15–12–133, which by its terms takes effect "after the usual voir dire questions have been put by the court." The balance of the panel was then questioned a second time, and additional jurors were excused for cause after both parties had had the opportunity to question them individually. Veniremembers Kidd and Woodlief were excused at this time.

The majority cites several cases in support of its observation that Georgia defense counsel frequently participate in the *Witherspoon* questioning of jurors. *Mincey v. State,* 251 Ga. 255, 304 S.E.2d 882, 889–90 (1983); *Castell v. State,* 250 Ga. 776, 301 S.E.2d 234, 244–46 (1983); *Allen v. State,* 248 Ga. 676, 286 S.E.2d 3 (1982); *Cofield v. State,* 247 Ga. 98, 274 S.E.2d 530, 535–36 (1981). There is no doubt that defense counsel do so participate; § 133 entitles them to. The question is when. None of the cases cited implicates a right of defense counsel to participate at the time the veniremembers are questioned by the court en masse, prior to their being called to the stand individually; indeed,

there is no indication in any of those cases that the panel was ever addressed en masse, or if it was, whether defense counsel were permitted to question the panel at that time.

To the extent the trial court foregoes assembly of the panel en masse, as appears to have been done in the cases cited by the majority, and instead waits until the veniremembers are called to the stand one at a time to ask them the statutory voir dire questions, it follows that the defendant's right to question the jurors individually commences as soon as the statutory questions are asked by the court. But in McCorquodale's case, the process was bifurcated: the statutory voir dire questions were posed to the panel en masse in phase I, with individual questioning to follow in phase II. Insofar as the statute entitles counsel to question the jurors individually only after the statutory voir dire questions have been asked, that right necessarily did not begin until after the first phase was completed, and after fifteen jurors were excused.

Objection to group questioning was made in *Arnold, supra,* a Fulton County case where the procedure was identical. There the jurors were asked the same questions and responded by raising their hands. Six were excused for cause over the objections of the defense. The Supreme Court said at 224 S.E.2d 390: "The defendant also contends that the statutory voir dire questions cannot be put to jurors as a group over objection. Code Ann. § 59–806 [now O.C.G.A. § 15–12–164]. We disagree." While going on to cite Ga.Code Ann. § 59–705 [now O.C.G.A. § 15–12–133], and saying that this fact gives defense counsel the right to examine jurors individually, the court points out that this is "... after the usual voir dire questions had been put by the court." There is no procedure in Georgia as examinations are conducted in Fulton County for the individual questioning to commence until after the trial court has excused the veniremen for cause.

Consequently, the question is a unique one for the juror, though not for the judge. It is thus incumbent upon the judge to see to it that the juror understands the question, and that the juror's opposition to the death penalty is indeed sufficiently strong to justify exclusion under *Witherspoon.* The trial court offered no such assistance in this case. The jurors' silence was presumed tantamount to understanding, and the strength of their opinions was presumed sufficient by their stepping forward.

Quite apart from whether the jurors understood the questions asked and responded as honestly as possible, is the question of whether the judge understood the jurors' answers. A juror's inability to set aside his opposition to capital punishment in reaching a verdict as to guilt or innocence must be stated unambiguously in order for his exclusion to be justified; equivocal responses are insufficient. *Maxwell v. Bishop,* 398 U.S. 262, 264–65, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221, 224 (1970). If a juror presented with the question of whether his opposition to capital punishment will prevent him from rendering an impartial verdict responds that he thinks so but is not sure, the judge should have little trouble in understanding that the juror is equivocating and that further questioning is necessary to render the juror's position unmistakably clear.[6] But how is equivocation or ambiguity to be detected when jurors respond nonverbally and en masse?

The majority supposes that "[t]he trial court was able to observe the juror's responses and demeanor for hesitancy or uncertainty that would have indicated that their responses were not 'unmistakably clear'." There is no denying that uncertainty or hesitation may be communicated nonverbally, and that a judge no less than

anyone else may be able to detect and comprehend such communication. Nonverbal communication, however, unlike verbal communication, is transmitted by any of several means: facial expression, hand gestures, eye movement, posture and body movement, to name but a few. R. Baron, D. Byrne, *Social Psychology* 45–56 (1979). It is unreasonable and contrary to common sense to expect that a trial judge would be able to attend to and assimilate the many nonverbal indicia of hesitation or equivocation manifested by any single venireperson, let alone nineteen, when all are responding at the same time. This conclusion is bolstered by studies in the field of cognitive psychology demonstrating the markedly diminished capacity of human beings to assimilate an isolated stimulus or piece of information when multiple stimuli are received simultaneously. A. Reynolds, P. Flagg, *Cognitive Psychology* 28–29 (1983); E. Carterette, M. Friedman (Ed's), *Handbook of Perception* Vol. IX "Perceptual Processing" 3–7 (1978).

It is true that a trial judge is in a position to observe the demeanor of jurors, and thus has an advantage over an appellate court, which has only a record to read. Nevertheless, even a trial judge cannot implement the strictures of the *Witherspoon* tests under the circumstances presented here. It is inconceivable that a trial court, utilizing a procedure whereby nineteen venirepersons answer two short questions nonverbally and en masse, can independently evaluate and adjudicate each of the juror's qualifications as required by *Witherspoon* and its progeny. Instead, the jurors themselves were permitted to make the decision as to whether they should be excluded from jury service by the mere expedient of stepping for-

---

**6.** In *Douglas v. Wainwright,* a venireperson who was asked if she could return a truthful verdict regardless of her opposition to the death penalty, initially responded: "I don't know; I just don't believe in capital punishment." 521 F.Supp. 790, 799 (M.D.Fla.1981). The district court, on habeas review, observed:

 Although the trial judge was again conducting the proper inquiry under *Witherspoon,* in that he was asking specifically whether her

opposition to capital punishment would interfere with her "bringing in a truthful verdict touching upon guilt or innocence", this venireperson initially did not respond in the unequivocal fashion that would, at that point, permit her exclusion for cause. Indeed, without further questioning, this would appear akin to the situation in *Maxwell v. Bishop*
 . . .
*Id.* at 800.

ward. *Witherspoon* requires unambiguous and unmistakably clear communication between jury and judge; any semblance of such clarity was lacking in this case, consequently rendering the brief en masse, nonverbal interrogation constitutionally inadequate.

### Part II: Individual Questioning

*Sylvia Woodlief's Interrogation*

*Witherspoon* and *Adams* require unequivocal answers by prospective jurors to questions propounded to them before they may be excluded by the state from the venire panel for cause. This is conceded in the majority opinion (at 1500–1501), which nevertheless concludes that the statement "I don't think I could do it, I really don't," is unequivocal.

Woodlief's individual *voir dire* [7] never established that she would automatically vote against the imposition of the death penalty, or that her convictions would preclude her from fairly deciding the question of guilt or innocence, or that she would not be able to adhere to her oath as a juror and apply the applicable law. Since she was not asked the questions to elicit this information, the majority reasons that the questions were not ambiguous. The district attorney had asked her if she would be fair and impartial and "go by the evidence and the law" to which she replied in the affirmative. He then asked her if she "really" believed in

capital punishment, and she said she did not. She then added that, "It's different being faced, you know, discussing capital punishment and sending someone to the electric chair." The trial court then interrupted and asked her whether she understood "the question that was posed to you awhile ago," to which Woodlief replied in the affirmative. She then volunteered that she "thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't." She was then immediately excused by the court over objection of defendant's counsel.

This individual voir dire examination demonstrates that the state of Georgia did not satisfy *Witherspoon*'s stringent test. A state is permitted to:

> execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Witherspoon,* 391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 785 n. 21 (emphasis in original).

7. THE CLERK: Miss Sylvia R. Woodlief.
THE JUROR: 200 26th Street, and I'm a salesgirl for Gillette.
BY MR. ENGLAND:
Q Miss Woodlief, you say you're what?
A I'm a sales representative for Gillette.
Q The razor blade company?
A Yes.
Q Have you served before on a jury in a criminal case this week?
A This week.
Q Do you recognize anyone at the other table?
A No.
Q Would you be fair and impartial in this case, go by the evidence and the law, let your verdict speak the truth on that basis?
A Yes.
Q Do you really believe in capital punishment?

A No.
Q You don't?
A No, I don't. It's different being faced, you know, discussing capital punishment and sending someone to the electric chair.
THE COURT: You didn't understand the question that was posed to you awhile ago?
THE JUROR: Yes, I did at that time. I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't.
THE COURT: All right, Mr. Ridley. That's grounds for excusal for cause.
You may be excused.
MR. RIDLEY: Your Honor, may I invoke the same objections as to the others?
THE COURT: Yes.
You may be excused.
R. at 400–01.

The leading case in this circuit [8] is *Burns v. Estelle,* 592 F.2d 1297 (5th Cir.1979), adhered to en banc 626 F.2d 396 (5th Cir.1980). The Fifth Circuit en banc decision was withheld until the Supreme Court decided *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The panel and the Supreme Court had under consideration § 12.31(b) of the Texas Penal Code which provided that a juror could not serve "unless he states under oath that the mandatory period of death or imprisonment for life will not affect his deliberations on any issue of fact." The panel described the examination of four members of the *Burns* venire panel—Doss, Mann, Tillman, and Mitchell—as follows:

> [E]ach said at least once that the mandatory death penalty would affect his or her deliberations on issues of fact. Mrs. Doss testified that she did not believe in the death penalty; Mrs. Mann testified that she had thought about the death penalty a lot and was against it, and in no circumstances could she give it. Mr. Tillman acknowledged additionally that he could not sit and decide this case due to the existence of the penalty, that it would be "real hard" to sit and listen objectively to the issues, and that he could not do it. Mrs. Mitchell commenced by saying that she did not think the mandatory sentence would affect her deliberations on the facts, but she later said it probably would affect her decision or deliberations and finally stated that she was sure her deliberations on issues of fact would be affected....

*Burns v. Estelle,* 592 F.2d 1297, 1300 (5th Cir.1979).

In holding that these types of statements were not sufficient to disqualify a juror, the *Burns* panel stated:

> Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Wither-*

*spoon* grounds. A mere disbelief in it, or even "conscientious or religious scruples against its infliction" will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law.

*Burns,* 592 F.2d at 1300 (footnote omitted).

In *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), a panel followed the *Burns* and *Adams* holdings and declared that the following did not meet the *Witherspoon* test:

> Of the five veniremen whose exclusion Granviel challenges, the district court held, in accordance with the magistrate's recommendation, that one venireman, Donald L. Harrison, was improperly excused for cause for merely voicing conscientious scruples against the death penalty. We, too, believe that Harrison's exclusion for cause constituted a *Witherspoon* violation. He was first asked whether he had conscientious scruples against the infliction of the death penalty, whereupon he stated, "I don't know what that means." When asked if he could ever vote to inflict the death penalty, he replied, "No, I don't *think* I could." Then, in response to the question, "You just don't *feel* like you would be entitled to take another person's life in that fashion?" He nodded and then said, "No, I could not." These questions and answers fall far short of an affirmation by Harrison that he would automatically vote against the death penalty regardless of the evidence, or that his objections to capital punishment would prevent him from making an impartial decision as to guilt.

*Granviel,* 655 F.2d at 677 (footnotes omitted; emphasis in the original). Sylvia Woodlief's answers are no different from those of Donald L. Harrison.

The *Hance v. Zant* panel followed *Adams, Burns,* and *Granviel,* holding that the following answers did not satisfy the *Witherspoon* test:

---

**8.** In *Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as precedent decisions of the Fifth Circuit.

MRS. MELTON: As I said before, I believe there are circumstances where the death penalty is warranted. I do not believe that I could vote for it.

\* \* \* \* \* \*

MS. TURPIN: Well, I don't know. I just say that I don't think I could.[9]

*Hance v. Zant,* 696 F.2d 940, 955 (11th Cir. 1983).

A panel of this court this year has said the following with respect to the *Witherspoon* test:

The Court, in explaining this test, has indicated a prospective juror must be permitted great leeway in expressing opposition to the death penalty before he or she qualifies for dismissal for cause. A prospective juror may even concede that his or her feelings about the death penalty would possibly color an objective determination of the facts of a case without admitting of the necessary partiality to justify excusal. The Court has stated:

Nor [does] the Constitution permit the exclusion of jurors from the penalty phase of a ... murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced, beyond reasonable doubt, but not other-wise, *yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be reasonable doubt.* Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law.

*Adams,* 448 U.S. at 50, 100 S.Ct. at 2529 (emphasis added).

*Witt v. Wainwright,* 714 F.2d 1069, 1081 (11th Cir.1983). *Witt* found the following voir dire improper:

Mr. Plowman [for the State]: Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

Ms. Colby: I am afraid personally but not—

Mr. Plowman: Speak up, please.

Ms. Colby: I am afraid of being a little personal, but definitely not religious.

---

9. PROSECUTOR: No matter what the facts or circumstances of this case might be, you do not believe that you could follow the instructions of the Court to consider the death penalty and vote to impose it, is that right?
MRS. MELTON: No, sir, as I said before, I feel there are times when the death penalty is warranted. I do not believe that I with my conscience could vote to impose the death penalty.
PROSECUTOR: No matter what the facts or circumstances of the case might be?
MRS. MELTON: In some cases I might.
Before excusing her for cause, the judge asked a final question.
THE COURT: Let me just ask her my question too, then, are you so conscientiously opposed to capital punishment that you would not vote for the death penalty under any circumstances?
MRS. MELTON: As I said before, I believe there are circumstances where the death penalty is warranted. I do not believe that I could vote for it.
COUNSEL: If you thought from the facts you heard in the whole case that that was the proper decision to make, that he should be electrocuted, could you vote that that was what you thought should be done?
MS. TURPIN: Well, this is hard, I don't know. I'm just too confused. I don't know.
\* \* \* \* \* \*
THE COURT: Well, what we want to find out is if he should be found guilty, after you've heard all the circumstances about this case, do you think that there is any way that you could vote to have him executed, that is, to find for the death penalty?
MS. TURPIN: Well, I guess I could.
\* \* \* \* \* \*
THE COURT: Well, that's what we need to find out whether or not you could vote for death if the circumstances of the trial, after you've learned all about it, whether or not you could, not that you would, whether you could vote to impose the death penalty?
MS. TURPIN: Well, I don't know. I just say that I don't think I could.
THE COURT: You don't think you could? I believe the juror should be excused for cause....
*Hance v. Zant,* 696 F.2d at 955.

Mr. Plowman: Now, would that interfere with you sitting as a juror in this case?

Ms. Colby: I am afraid it would.

Mr. Plowman: You are afraid it would?

Ms. Colby: Yes, sir.

Mr. Plowman: Would it interfere with judging the guilt or innocence of the defendant in this case?

Ms. Colby: I think so.

Mr. Plowman: You think it would?

Ms. Colby: I think it would.

Mr. Plowman: Your Honor, I would move for cause at this point.

THE COURT: All right. Step down. Prospective juror Colby's responses are limited to expressions of her feelings and her thoughts on the subject of inflicting the death penalty. At no point did she unequivocally state that she would automatically be unable to apply the death penalty or to find petitioner guilty if the facts so indicated. Her statements fall

far short of the certainty required by *Witherspoon* to justify for cause excusal. Perhaps her responses are so devoid of the necessary certainty because of the State's failure to frame its questions in an appropriately unambiguous manner. *Witt,* 714 F.2d at 1082. The majority opinion does not purport to overrule *Burns, Granviel, Hance,* or *Witt, supra,* since those cases properly interpret the *Witherspoon-Adams* test. Given our requirement to follow the Supreme Court opinions, the majority opinion is inexplicable.[10]

### Allen L. Kidd's Interrogation

A review of the examination of juror Allen Kidd reveals that he too was improperly excused under the *Witherspoon-Adams* test.[11] The majority opinion holds that Kidd made it unmistakably clear that he was opposed to the death penalty and that he was unable to set aside such opposition and follow the law and the evidence and

---

**10.** *See Maxwell v. Bishop,* 398 U.S. 262, 264, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221, 224 (1970) (improper excusal based upon answers of "I think I do" and "I'm afraid I do"); *Segura v. Patterson,* 403 U.S. 946, 91 S.Ct. 2280, 29 L.Ed.2d 856, *rev'g* 402 F.2d 249 (10th Cir.1971) ("I don't think I can bring in the death penalty"); *Funicello v. New Jersey,* 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859, *rev'g* 52 N.J. 263, 245 A.2d 181 (1968) ("I don't think I could . . .").

**11.** All right now, call us another one.

THE CLERK: Allen L. Kidd.

THE JUROR: 3300 Sewell Road. I work for the Powell View Company.

BY MR. ENGLAND:

Q Mr. Kidd, I couldn't tell where you worked.

A Powell View Company.

Q A nursing home?

A Yes.

Q Have you served before in a criminal case?

A No.

Q Do you recognize anybody at the other table?

A No.

Q Would you be a fair and impartial juror in this case and just let your verdict speak the truth based on the evidence that comes out in court and the law that his Honor gives you?

A Yes.

Q Do you really believe in capital punishment?

A To a certain extent.

Q To a certain extent?

A Yes, sir.

Q Do you feel there are cases where under the evidence it would be a right and just verdict?

A Well, in a way.

Q Well, when it comes down, like the last lady said, from a theoretical point to where a juror would be asked to vote, do you think you could really never vote for the death penalty no matter what the evidence was?

A No, sir.

Q You don't think you could?

MR. ENGLAND: If your Honor please, I believe it should be executed for cause.

THE COURT: You say you never could vote for it regardless of the circumstances?

THE JUROR: No, sir.

THE COURT: Did you hear the question that was posed to you just awhile ago? Did you understand the question?

THE JUROR: No, I did not understand.

THE COURT: You could not under any circumstances vote for the death penalty?

THE JUROR: No.

THE COURT: Is that right, under any circumstances?

THE JUROR: No.

THE COURT: In that case, you may be excused.

MR. RIDLEY: May the same objection be noted?

THE COURT: Yes.

R. at 401–04.

return a verdict for the death penalty. Instead, a review of the complete interrogation reflects a morass of ambiguities. First, Kidd states that he could be a fair and impartial juror and that his verdict would speak the truth based on the evidence and the law presented. He then states that to a certain extent he believes in capital punishment. He further states that "in a way" he feels that there are cases where the death penalty would be a right and just verdict. To that point, Mr. Kidd is making it clear that he is a juror who could be eligible to sit on the jury even though he might have some doubts about a death penalty in some cases.

The district attorney then asked "do you think you could really never vote for the death penalty no matter what the evidence was," to which Kidd answers "no." The majority opinion reads the answer to that question to be "yes" instead of "no." After that answer, the district attorney moved the court to excuse Mr. Kidd for cause. The court asked Mr. Kidd the same question and got the same no answer, which reflects that Mr. Kidd *could* vote for the death penalty. The court then asked the juror if he heard "the question that was posed to you just awhile ago" and did you understand the question, to which the juror said, "No, I did not understand." The court then asked, "You could not under any circumstances vote for the death penalty," to which the juror answers "no" and again "no" when the court asks, "Is that right, under any circumstances?" The majority opinion reasons: "Any initial misunderstanding or uncertainty on Kidd's part was thus resolved by the subsequent questions asked of him and the unequivocality of his responses." (at 1502). An ambiguous question with a double negative that elicits a meaningless response cannot be the basis of unequivocality.

### Conclusion

The writ should be granted conditionally in this case for a retrial of the sentencing issue. The *Witherspoon* Court had before it the issue of whether a state could challenge for cause *any* prospective jurors who held conscientious objections about the death penalty. *Witherspoon* held that a state could remove such a juror, but only after the juror is interrogated and (1) it is established that the juror understood the phrases and words used in the interrogation; and (2) the juror makes it unmistakably clear, by means of unambiguous responses, that he would be unable to set aside his conscientious opposition to the death penalty and abide by his oath as a juror.

The test established in *Witherspoon* is rigorous. It places upon the state the burden of showing that a juror is not qualified before exclusion for cause can be justified, and it requires that the trial court carefully weigh the views of each conscientious objector in determining whether the state has met its burden. These requirements were not satisfied here with regard to the fifteen jurors questioned as a group, or as to jurors Woodlief and Kidd.

Group questioning is not condemned in all cases, but where a defendant's constitutional right to have a balanced jury is at stake, there is no excuse for a cursory, preemptive examination that does not permit the full sifting of jurors' views. The holding that jurors Woodlief and Kidd were unqualified and properly excluded flies in the face of precedent in the Supreme Court and our circuit. McCorquodale is entitled to a sentencing hearing before a new, properly qualified petit jury.

GODBOLD, Chief Judge, with whom JOHNSON, Circuit Judge, joins, dissenting:

I respectfully dissent, and I concur in Part II of the dissenting opinion filed by Judge Clark.