**William Kenny STEPHENS, Petitioner,**

v.

**Ralph KEMP, Respondent.**

**Civ. A. No. CV183–280.**

United States District Court,
S.D. Georgia,
Augusta Division.

June 8, 1984.

Alison Pease, John Rogers Carroll, Charles A. Glackin, Philadelphia, Pa., James K. Jenkins, Savannah, Ga., for petitioner.

Paula K. Smith, Asst. Atty. Gen., Marion O. Gordon, William B. Hill, Jr., Atlanta, Ga., for respondent.

## ORDER

BOWEN, District Judge.

Petitioner is under sentence of death. Before the Court is his petition for a writ of habeas corpus.

On February 15, 1980, a jury in the Superior Court of Richmond County, Georgia, found William Kenny Stephens guilty of one count of murder and three counts of aggravated assault. The next day, Stephens was sentenced to death for the murder and to consecutive twenty year sentences on each aggravated assault count. In its opinion affirming the conviction and sentences, the Supreme Court of Georgia set forth the facts of the case:

> The record establishes that on January 22, 1979, the police stopped the defendant for questioning regarding the burglary of a department store in which several weapons had been taken. It was discovered that he was driving under the influence and without a license, whereupon he was arrested. After being questioned at the police station, the defendant agreed to ask around and find out who was involved in the burglary in exchange for his release upon his own recognizance. As a condition to his release, he was to report back by a certain time. When he did not contact the officer at the appointed time, nor for two days thereafter, the police began to look for him. On January 24, investigator Larry Stevens of the Richmond County Sheriff's Department located the defendant, followed [his automobile] a short way and then stopped him. When the officer stopped the defendant, he radioed this fact and his location to fellow officers.

> After the investigator stopped his automobile, he opened his car door and apparently leaned back to do something with his radio. The defendant fired into the car through the windshield striking investigator Stevens in the right forearm and rendering his right arm below the elbow useless. The police officer managed to get his gun out and fired wild shots through his automobile at the defendant. The defendant fired a second shot striking the officer in the right side. Then the defendant walked to the rear of the investigator's automobile, turned, raised the weapon up to shoulder height, and fired in a very calm, deliberate manner through the rear window. The round hit the officer in the chest and was almost immediately fatal. The defendant then went to his car and drove off at a high rate of speed. He intended to go to his mother's house, but stopped on the way at a store to purchase more ammunition. When he approached his mother's house, authorities were waiting for him, and a high speed pursuit then occurred. This occurred approximately twenty-five minutes after the murder. Officers finally trapped the defendant in a cul-de-sac, and a gun battle with the police then ensued. The defendant maintained that when investigator Stevens stopped him, he exited his automobile with a loaded rifle in order to show the officer that he had recovered some of the guns from the burglary and that as he approached the officer's car, the officer for no reason, shot at him at which instance the defendant then opened fire shooting the officer in self-defense.

> "Monkey" Warren testified that the defendant and Paul Lewis came to him on the Sunday night before the victim was killed and showed him some guns they wanted to sell him. The defendant showed him a rifle of the same type that killed the victim and when he didn't want to buy it, the defendant shot through the floor and left.

*Stevens [sic] v. State,* 247 Ga. 698, 699, 278 S.E.2d 398, 401 (1981), *cert. denied,* — U.S. —, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983).

Petitioner, through counsel, filed a petition for a writ of habeas corpus on August 25, 1983 in the Superior Court of Butts County, Georgia. The same day, the court held a hearing and denied habeas relief. On August 26, 1983, the Supreme Court of Georgia denied petitioner's application for a certificate of probable cause to appeal.

Also on August 26, 1983, petitioner filed in this Court a petition for a writ of habeas corpus and a motion for a stay of execution. Petitioner traveled rapidly through the judicial system because he was scheduled to be executed on August 29, 1983. The Court granted the petitioner's motion for a stay of execution.

Afterward, petitioner's counsel, who had represented petitioner at trial and throughout the various appeals and petitions for habeas relief, withdrew, and new counsel entered the case. New counsel amended the petition to include numerous allegations of ineffective assistance of trial counsel. The claims of ineffective assistance of counsel had never been presented to the state courts. Therefore, this Court dismissed the petition under authority of *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). *Stephens v. Kemp*, 578 F.Supp. 103 (S.D.Ga.1983).

Petitioner again journeyed quickly through the court system because on November 29, 1983, he was rescheduled to be executed on December 12, 1983. On December 7, 1983, petitioner returned to the Superior Court of Butts County, Georgia, with a petition for a writ of habeas corpus. After a hearing, the court denied relief and ordered the petition dismissed, reasoning that the petition was successive and that petitioner had waived his ineffective assistance of counsel claim by not raising it in his original state habeas petition. The Supreme Court of Georgia on December 8, 1983, denied petitioner's application for a certificate of probable cause.

The following day, petitioner filed in this Court another petition for a writ of habeas corpus. The Court granted a stay of execution.

The Court originally scheduled a hearing on this case for January 24, 1984. Due to the unexpected illness of one of petitioner's lawyers, the Court postponed the hearing and later scheduled it for April 3, 1984.

At the hearing held April 3, 1984, petitioner's counsel identified several claims that would not be pursued: (1) the claim that trial counsel was ineffective for his failure to reveal a conflict of interest between his representation of petitioner and his alleged representation of the sole eyewitness of the shooting of Investigator Stevens; (2) the claim that trial counsel was ineffective because of his failure to challenge adequately the admissibility of petitioner's pretrial statements to police; (3) the claim that trial counsel was ineffective due to his failure to challenge the grand and petit jury arrays in Richmond County, Georgia; (4) the claim that trial counsel was ineffective because of his failure to prepare and present sufficient evidence for a change of venue; (5) the claim that trial counsel was ineffective because of his failure to challenge the adequacy and methodology of the review of death penalty cases by the Supreme Court of Georgia; (6) the claim that the trial court erred because of its failure to sever the trial on the murder charge from the charges of aggravated assault; (7) the claim that the trial court erred because of its failure to grant petitioner's motion in limine; (8) the claim that the trial court erred because of its failure to conduct a sequestered voir dire; (9) the claim that the trial court erred because of its failure to grant a change of venue; and finally, (10) the claim that the trial court erred because of its failure to exclude petitioner's pretrial statements from the evidence. In that the petitioner announced that these stated claims would not be urged at the hearing, the Court will treat such issues as abandoned and will not address their merits.

Also at the hearing, counsel for the petitioner and the respondent identified the issues which they believed to require an evidentiary hearing in federal district court. No state court had heard evidence on the ineffective assistance issue. The

Court, unwilling to follow respondent's argument to extend the doctrine of procedural default to the state habeas procedure, *Francis v. Spraggins,* 720 F.2d 1190, 1192 n. 3 (11th Cir.1983), conducted an evidentiary hearing on the claim of ineffective assistance of counsel. At the conclusion of the evidentiary hearing, for reasons stated in open court, I found and concluded that counsel had not been ineffective. Petitioner received "representation that fell within the range of competence demanded of attorneys in criminal cases and conformed to professional standards of reasonable investigation of the facts and understanding of the law." *Birt v. Montgomery,* 725 F.2d 587, 597 (11th Cir.1984); *see also, Tucker v. Zant,* 724 F.2d 882, 894, *reh'g en banc granted,* No. 83–8137 (11th Cir. Mar. 15, 1984).

Petitioner requested the Court to conduct an evidentiary hearing on additional issues, including the issue of whether or not trial counsel should have more vigorously sought expert witnesses to testify at trial and the issue of whether or not the trial court should have permitted funds to pay expert witnesses to assist petitioner and his counsel. Petitioner sought to present to this Court what the experts could have testified to if only they had been obtained for and testified at the trial. Petitioner's habeas counsel was most anxious to establish that Investigator Stevens fired first and that petitioner Stephens acted in self-defense. I allowed petitioner to make an offer of proof but for reasons stated in court did not permit an evidentiary hearing on the issues concerning expert witnesses.[1] Furthermore, again for reasons stated in court, I concluded that the trial court did not err in its denial of funds for experts to assist petitioner at trial.

Petitioner seems to have lost sight of the purpose of habeas corpus review and would have this Court do so as well. The words of the Supreme Court of the United States provide a useful reminder:

The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo* but, rather, to review for violation of federal constitutional standards. In that process we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court. . . .

*Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972). Petitioner acted well beyond the bounds of self-defense. He shot at the victim three times at close range with a high-powered rifle. The third and fatal shot, observed by the eyewitness, "was deliberate and inflicted only after the officer was lying helplessly in his automobile, seriously wounded." *Stevens [sic] v. State,* 247 Ga. at 709, 278 S.E.2d at 408.

In his petition, petitioner, an indigent black male, asserted that the death penalty is unconstitutionally applied in a discriminatory manner against poor black defendants. At the hearing held April 3, petitioner made clear that he was relying upon the "Baldus Study" to support his assertion. Petitioner informed the Court that to present the study to the Court by means of an evidentiary hearing would be prohibitively expensive. Petitioner, however, urged the Court to take notice of the data presented in the case of *McCleskey v. Zant,* 580 F.Supp. 338, 339 (N.D.Ga.), *appeal filed,* 729 F.2d 1293 (11th Cir.1984), to Judge J. Owen Forrester. As I indicated at the hearing, I accept Judge Forrester's assessment of the study: "In *Baldus's* opinion, based on his entire study, there are systematic and substantial disparities existing in the penalties imposed upon homicide defendants in the State of Georgia based on race of the homicide victim." *Id.* at 365 (emphasis in original). In other words, Baldus concluded that a person found guilty of murdering a white person is more likely to receive the death penalty than a person found guilty of murdering a black person.

---

1. The proffer includes with express permission of the Court the deposition of Leroy Riddick taken in Mobile, Alabama. Although I originally did not intend to extend discovery to include Riddick and Mobile and entered an order accordingly, the deposition was in progress when the order was entered and the point was rendered moot.

The present case belies the study. The victim, Investigator Stevens, was black.

### The *Witherspoon* Issue

Other issues were not decided by the Court at the hearing and remain to be resolved. Petitioner argues that he is entitled to habeas relief because jurors were excused in contravention of the rule the United States Supreme Court elucidated in the case of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In the *Witherspoon* case, the Supreme Court fashioned the rule that prospective jurors cannot be excused from jury service on the basis of their opposition to the death penalty unless they make it

> unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). "The law in this circuit demands strict adherence to *Witherspoon's* requirements." *Goodwin v. Balkcom*, 684 F.2d 794, 815 (11th Cir.1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). The interpretation of the rule, however, need not be "rigid" or "unthinking." *Williams v. Maggio*, 679 F.2d 381, 386 (5th Cir.1982), *cert. denied*, — U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

Petitioner asserts that jurors Farr, Clark, Parkmon, and Hall were improperly excused because they expressed only tentative or equivocal opposition to the death penalty. "[A] mere reluctance in or an abstract belief against capital punishment is not sufficient grounds for challenging a juror for cause." *Smith v. Whisman*, 431 F.2d 1051, 1052 (5th Cir.1970). "[D]oubts concerning the ability of a venireman to subordinate his personal views to his oath as a juror to obey the law of the state should be resolved against exclusion...." *Marion v. Beto*, 434 F.2d 29, 31 (5th Cir.

1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646 (1971). *See also Darden v. Wainwright*, 725 F.2d 1526 (11th Cir.1984).

■ "Close scrutiny of the voir dire examination of each juror is necessary for the resolution of this issue." *Williams*, 679 F.2d at 384. The issue presents a mixed question of law and fact and therefore requires this Court to exercise its own judgment on the blend of facts and their legal values. *Darden*, 725 F.2d at 1529. Nevertheless, my "review must take into account that the trial judge was in a much better position to evaluate the clarity of a juror's response." *McCorquodale v. Balkcom*, 721 F.2d 1493, 1498 (11th Cir.1983) (*en banc*); *see also Darden*, 725 F.2d at 1530.

My close scrutiny of the voir dire begins with an examination of the questioning of jurors Farr and Clark:

"THE COURT: Are you, or any of you, conscientiously opposed to capital punishment? All right, your name, please, ma'am?

"A JUROR: Katherine Farr, F–A–R–R

"THE COURT: And, yes, sir?

"ANOTHER JUROR: Thomas L. Clark.

"THE COURT: Please remain standing. Thomas L. Clark. Did all of you understand that question: Are any of you conscientiously opposed to capital punishment? Is there any misunderstanding in the mind of anyone of what I mean by capital punishment? No indication. Please remain standing while I ask you several more questions, these two. Would your reservation—and the questions are asked of both of you—would your reservations about capital punishment prevent you from making a impartial decision as to the defendant's guilt?

"MRS. FARR: I would think so.

"MR. CLARK: No.

"THE COURT: It would not, Mr. Clark said. Are your reservations—the question again is directed to both of you—are your reservations about capital punishment such

that you could never vote to impose the death penalty? Mr. Clark?

"MR. CLARK: No.

"THE REPORTER: What was her reply?

"THE COURT: Her reply was, 'Yes.' Again, a question to both of you, Are your reservations about capital punishment such that you would refuse even to consider its imposition in the case before you?

"MRS. FARR: I wouldn't consider it.

"MR. CLARK: No.

"THE COURT: And again the question to both of you, Are you irrevocably committed before the trial has begun to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of these proceedings? Mr. Clark?

"MR. CLARK: Yes.

"THE REPORTER: What was her reply?

"THE COURT: Her reply was, 'Yes.' Both replies were, 'Yes'." [2]

The trial court, overruling the objection of defense counsel and refusing to permit defense counsel to question juror Farr, excused Mrs. Farr for cause.

■■■ Petitioner argues that the trial court erroneously excused Farr because defense counsel first should have been given the opportunity to examine her. Petitioner suggests that defense counsel should have been allowed to question Farr because the trial court possibly did not understand accurately Farr's responses of "Yes." The record contains no suggestion that the trial judge did not correctly hear Farr, and this Court will not question the comprehension of the judge who was physically present at voir dire. *See McCorquodale*, 721 F.2d at 1498, 1500–1501. Petitioner also suggests that Farr's first response, "I would think so," taints her opposition to the death penalty as ambiguous and that perhaps Farr did not understand the questions asked of her; therefore, petitioner argues, counsel should have been permitted to examine her.

"It is the juror's ultimate conclusion by which the court judges whether the juror is unequivocally opposed to the death penalty." *Id.* at 1500. Farr ultimately concluded that she was unequivocally opposed to the death penalty. As for the suggestion that Farr did not understand the questions asked of her, again this Court will not dispute the conclusion of the trial judge who was able to observe Farr's "tone of voice and demeanor." *Id.* at 1500–1501. Finally, petitioner argues that defense counsel should have been allowed to ask Farr whether she could subordinate her views to her oath as a juror. The question was unnecessary because it was subsumed in the questions the trial court asked of Farr. *Id.* at 1500. The trial court properly excused Farr under *Witherspoon*.

Although the trial court did not permit defense counsel to question juror Farr, defense counsel was allowed to examine juror Clark:

"THE COURT: Your name is Thomas L. Clark?

"THE JUROR: Yes, sir.

"BY [DEFENSE COUNSEL]:

"Q. Mr. Clark, if this trial gets to the penalty phase, the issue to be considered would be whether the Court would impose the penalty of death or a penalty of life imprisonment. At that point, evidence will be offered on the issue of punishment. The Court will then charge you the law on the issue of punishment. Would you be willing to consider all the evidence and the law before reaching a verdict?

"A. I will answer this way. It's my religious conviction: I cannot give a life, and I do not take a life.

"Q. All right, sir, if the law charged to you that you must consider is that regardless of the facts of the case, under no circumstances must you impose a death penalty—under no circumstances must you impose a death penalty, do you then believe that you could consider the facts of the case from the evidence presented, look at

it, deliberate it, and vote what you feel ought to be done?

"A. Yes." [3]

After legal argument, the trial court excused juror Clark for cause.

■ Petitioner argues that Clark should not have been excused under *Witherspoon* because his answers did not make unmistakably clear his automatic opposition to the death penalty. Clark's conflicting responses to the trial court's questions indicated some ambiguity in his position, but Clark removed any uncertainty about his stance against the death penalty when he responded to defense counsel's question stating, "It's my religious *conviction:* ... I do not take a life." (emphasis added). No mere scruple interfered with Clark's ability to act as a juror in the case; rather, Clark was convinced because of a strong belief that he could not vote to impose the death penalty. When informed that under no circumstances *must* a juror impose a death penalty, Clark answered, "Yes," he could vote for what *he felt ought* to be done. His earlier answers taken together, however, indicated that he did not feel the death penalty ought to be imposed and that he could not vote to impose it. The trial court did not improperly excuse juror Clark. *See McCorquodale,* 721 F.2d at 1500–1502.

■ Petitioner argues that juror Parkmon was the next juror that the trial court improperly excused. Thus, an examination of the voir dire of Parkmon is necessary:

"THE CLERK: Doris C. Parkmon.

"BY [the DISTRICT ATTORNEY]:

"A. Doris C. Parkmon, separated, I have one daughter 13, I work for the Revco department—Revco Drug Store, and I'm a member of the Bibleway Church of Our Lord Jesus Christ Apostolic Faith.

"Q. How long have you been employed by Revco?

"A. Five years and some months.

"Q. You mentioned, I believe, early this morning when I was asking the panel ques-

tions that you might be uncomfortable sitting as a juror in a case in which the death penalty was involved, is that correct?

"A. Right.

"Q. Could you give me some idea of the reasons of your discomfort?

"A. Some idea of the reasons?

"Q. Yes, ma'am, the reason for your answer to that.

"A. Well, my reason would be that I don't want to impose the death penalty on nobody. The Bible says, 'Thou shalt not kill.'

"Q. You don't believe that the death penalty should be imposed on anybody, is that ...

"A. Well, for myself, you know, for myself saying it. But, then, according to the laws of the land, the State, if that's their rules, you know, whoever would, it would be okay for them, but not for me.

"Q. Well, okay, let me ask you some more questions about the death penalty, if I can understand it better. Would it be fair to say that you personally, yourself, oppose the death penalty?

"A. Right.

"Q. Okay, would your opposition to the death penalty be such that it would make it difficult for you to sit on a case in which the death penalty was involved?

"A. Right.

"Q. Would your opposition to the death penalty—your personal opposition, now, to the death penalty—be such that it would make it difficult for you to be impartial in determining the guilt or innocence of a person in which you knew the State was going to attempt to have the death penalty imposed?

"A. Yes.

"Q. It would make a difference?

"THE COURT: Speak up now.

"A. Right.

"Q. Would it be fair to say that your reservations or your personal feelings

3. Trial Transcript at 14.

about the death penalty are such that you just personally wouldn't vote for the death penalty regardless of the circumstances?

"A. Yes, I myself wouldn't want to, but even though all the evidence is in and obeying the rules and regulations of the land, I'm not against that, but I'm against myself personally.

"Q. Okay, I'm not sure I understand you, and I think it's a lack in me, not you, so let me ask you a few more questions. Do I understand you to say that you understand the law ...

"A. Right.

"Q. ... you would listen to the law, listen to the charge of the Court, and listen to the evidence ...

"A. Yes.

"Q. ... but you yourself could not bring yourself to vote for the death penalty; is that basically what you are saying?

"A. Yes.

"Q. Okay, so you would consider the evidence, you would listen to the charge of the Court ...

"A. Yes.

"Q. ... but if within the charge of the Court you had two options, that is to bring a life sentence or a death penalty, you are not going to bring a death penalty regardless of the evidence; is that correct?

"A. I mean, my conscience wouldn't let me.

"Q. Okay, would it be fair to say that you are irrevocably committed to voting for life, if that is allowable under the laws of the land, prior to hearing any evidence?

"A. Voting for life? No, I would like to hear the evidence first.

"THE COURT: Rephrase that question again, ....

"Q. Okay, would it be fair to say that you are irrevocably committed to voting against the death penalty?

"A. Against it.

"Q. Against the death penalty regardless of the evidence?

"A. Did you say vote against it?

"Q. If you have a choice by the Court? That is, that you may return a life sentence or you may return a death verdict. You are irrevocably committed to voting against the death penalty before hearing any of the evidence in the case; that is your feeling?

"THE COURT: Is that a fair statement?

"A. Probably.

"THE COURT: Now, understand you are a member of a jury panel, or you will be possibly with 11 others. The question is, are you as a member of that jury—potential trial jury to try the case, are you irrevocably committed before this trial is begun, before any evidence, testimony, or anything is in, are you irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of these proceedings?

"A. What you're asking me is have I formed an opinion, right?

"THE COURT: Not as to the guilt or innocence ...

"A. Not, I mean, not him.

"THE COURT: ... not as to his guilt or innocence.

"A. I mean, just in general.

"THE COURT: I mean, that's what I'm not asking, because none of us have that, opinion, no evidence has been introduced. But I'm saying—we're discussing your feelings about capital punishment and the death penalty, and the crucial question I'm asking you is, are you committed, without a doubt committed, before the trial is begun to vote against the penalty of death regardless of the facts and circumstances that might come out in the course of this trial?

"A. Yes.

"[DISTRICT ATTORNEY]: I have nothing further, Your Honor. And I move to strike the juror for cause on the basis of Mrs. Parkmon's answers to the questions propounded by the Court as to the death penalty.

**238**

"THE COURT: I understand. I'm going to give the defense an opportunity to examine the juror. Proceed.

"[DEFENSE COUNSEL]: Thank you, Your Honor.

"BY [DEFENSE COUNSEL]:

"Q. Mrs. Parkmon, you have heard, I assume, today, heard it explained that in a trial such as this one there are two phases if a verdict of guilt is returned; if the verdict is for acquittal, of course, that's it. But do you believe in your mind that you could follow the instructions of the Court, knowing that the law would never require you to vote for the death penalty, do you believe you could follow the instructions of the Court as to what the law is and follow the evidence in the case and reach a true verdict on the issue of guilt or innocence?

"A. Yes.

"Q. In other words, if the law and facts convince you that the defendant is guilty beyond a reasonable doubt, you would vote to find him guilty; is that correct?

"A. Yes.

"Q. And if the law and the facts convince you that he was innocent or if the State failed to prove he was guilty, you would find him innocent; is that correct?

"A. Yes.

"Q. Your views on capital punishment have nothing at all to do with that fact, is that right?

"A. Right.

"Q. And should it arise that this defendant was found guilty of a capital offense and the District Attorney decides to seek the imposition of the death penalty, and evidence is presented on the penalty both for and against it, would you be willing to consider the law—just consider the law as given you by the Court and all the evidence before voting on the penalty phase?

"A. Yes." [4]

The trial court did not improperly excuse juror Parkmon. Although she stated that she could *consider* the law and the evi-

dence, she made clear that even after her consideration, she could never vote to impose the death penalty.

■ Juror Hall is the last juror whose voir dire the Court must examine:

"THE COURT: Rosie G. Hall.

"A. My name is Rosie G. Hall, and I resides at 105 Kinchley Court here in Augusta, and I'm a member of the Bibleway Church of the Lord Jesus Christ. And I have one daughter, and she's a social worker for the Department of Welfare in Long Island City. And I'm presently employed at Augusta's Hope.

"THE COURT: Augusta Hope?

"A. Yes, sir.

"BY [DISTRICT ATTORNEY]:

"Q. Mrs. Hall, are you opposed to the death penalty?

"A. Yes.

"Q. You are personally conscientiously opposed to it?

"A. Yes, yes.

"Q. I thought you might be when you mentioned your occupation. Do you feel that your reservations about the death penalty are such that you would just not vote to sentence anybody to death because of the evidence?

"A. Right, yes.

"Q. All right, and you feel—would it be fair to say, Mrs. Hall, here before you've heard really any of the evidence in the case that you were irrevocably committed not to return a verdict of death?

"A. Yes.

"Q. Thank you very much.

"[DISTRICT ATTORNEY]: Your Honor, we're going to make a motion, but I believe [defense counsel] will want to examine this witness.

"BY [DEFENSE COUNSEL]:

"Q. Mrs. Hall, you do understand, do you not, that the question of guilt or innocence is separate from that of punishment? Do you understand that?

4. Trial Transcript at 235–240.

"A. Yes, yes.

"Q. And you do understand that there are no circumstances under the law of Georgia under which you must sentence someone to death; do you understand that?

"A. Yes.

"Q. Well, knowing that, would your opposition to the death penalty have any effect on your decision in the guilt or innocence stage?

"A. Yes, it would.

"Q. What effect would it have?

"A. Well, because of my religious belief, I cannot give a life, nor could I comprehend anyone taking an individual's life.

"Q. But what I'm trying to get at is, would your feelings against the death penalty influence your decision in guilt or innocence; in other words, if the evidence indicates or proves the defendant guilty beyond a reasonable doubt, could you vote him guilty?

"A. Well, yes, yes.

"Q. And if the evidence proves him guilty beyond a reasonable doubt, would you vote him guilty?

"A. Yes.

"Q. If the evidence fails to prove him guilty beyond a reasonable doubt, would you vote him not guilty?

"A. Yes, I can say not guilty, but ...

"Q. In other words,—well, okay." [5]

Reading the voir dire of juror Hall in its entirety, this Court cannot find and conclude that she was improperly excused. She stated that she could vote to find the defendant guilty but that she could never vote to impose the death penalty.

Petitioner also argues that the "[u]se of a death qualified jury at the guilt/innocence phase was unconstitutional." [6] "This argument has been rejected in this Circuit." *Spencer v. Zant,* 715 F.2d 1562, 1577 (11th Cir.1983), *reh'g en banc granted.*

## Jury Charges at the Guilt/Innocence Stage

■ Petitioner asserts that he is entitled to habeas relief because "the charge of the trial court during the guilt/innocence phase of petitioner's trial was fundamentally unfair in violation of the due process clause since it failed to give legal recognition to the defense of self-defense and left the jury without proper guidance as to how that defense should be evaluated." [7] The trial court gave an instruction on self-defense:

Members of the Jury, I charge you that a person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat or force is necessary to defend himself against another's imminent use of lawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily injury to himself, or a third person. A person is not justified in using force under the circumstances specified above if he initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon his assailant; or he is attempting to commit, committing, or fleeing after the commission or the attempted commission of a felony; or was the aggressor, or was engaged in a combat by agreement, unless he withdraws from the encounter and effectively communicates to such other person his intent to do so, and the other notwithstanding continues or threatens to continue the use of lawful force. I charge you that if you believe the defendant did shoot and kill the deceased as alleged in the bill of indictment, but if you believe he did so in defense of his own person against an

---

5. Trial Transcript at 494–496.

6. Memorandum of Law in Support of Petition for Habeas Corpus at 86.

7. Memorandum of Law in Support of Petition for Habeas Corpus at 49.

unjustified, violent assault sought to be inflicted upon him by the deceased, then you should acquit the defendant. And I further charge you that if there were a seeming necessity to take human life, that is, if as a reasonably courageous man under the facts and circumstances as they existed, or appeared to him to exist, the defendant believed his life was about to be taken in such justified—unjustified, violent, felonious assault on his person and in good faith acted upon those fears and not in a spirit of revenge, the defendant would be justified.[8]

The jury instruction was proper under the facts of the case, and petitioner's argument that he is entitled to habeas relief on the basis of the charge is without merit. *See Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

■ Petitioner also argues that portions of the jury charge were improperly burden-shifting in violation of the Supreme Court's holding in the case of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). To decide the issue, the Court must examine the language to which petitioner has objected in the context of the entire charge. *Naughten*, 414 U.S. at 147, 94 S.Ct. at 400. Toward the beginning of the charge, the trial court instructed the jury on the presumption of innocence:

The defendant enters into the trial of this case with the presumption of innocence in his favor, and that presumption remains with him throughout the trial and until his guilt is established by the evidence beyond a reasonable doubt. The burden is on the State to prove every material allegation in this bill of indictment against this defendant to a moral and reasonable certainty and beyond all reasonable doubt.[9]

Later, the trial court gave an instruction on intent:

Members of the Jury, a crime is a violation of a statute of this state in which there shall be a union of joint operation of act and intention. A specific intent to commit the crimes charged in this indictment is an essential element that the State must prove beyond a reasonable doubt. You may find such intention or the absence thereof upon a consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused—the act or acts for which the accused is being prosecuted.[10]

■ Petitioner's objection to the jury charge focuses on the instruction on malice, an element of the offense of murder under the law of Georgia, Ga.Code Ann. § 26–1101 (Harrison Co. 1978), now codified at Ga.Code Ann. § 16–5–1 (1982). Intent to kill is a component of the malice element. *Lamb v. Jernigan*, 683 F.2d 1332, 1337 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). Thus, the trial court's instructions elaborate upon criminal intent, as well as malice:

Members of the Jury, I charge you that a person commits murder when he unlawfully and with malice aforethought, either express or implied, caused the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. Before you would be authorized to find the defendant guilty of the offense of murder, you must find and believe beyond a reasonable doubt that the defendant did with malice aforethought, either express or implied, cause the death of Larry W. Stevens, Sr.

I charge you that if you find and believe that at any time prior to the date this indictment was returned into this court that the defendant did in the Coun-

---

**8.** Trial Transcript at 1120–1121.

**9.** Trial Transcript at 1111.

**10.** *Id.* at 1114–1115.

ty of Richmond, State of Georgia, with malice aforethought kill and murder Larry W. Stevens, Sr., in the way and manner set forth in the indictment, then you would be authorized to find the defendant guilty of murder. Members of the Jury, I further charge you in that regard that malice in its legal sense is not necessarily ill will or hatred. It is the unlawful, deliberate intention to kill a human being without justification or mitigation or excuse, which intention must exist at the time of the killing. It is not necessary, however, that this unlawful, deliberate intention should exist for any particular length of time before the killing. If it enters the mind of the slayer the moment before he fires the fatal shot, or strikes the fatal blow, or inflicts the fatal wound, that is sufficient.

Members of the Jury, the law presumes that a person intends to accomplish the natural and probable consequences of his acts. If a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill. This is and always shall be in a trial of this case a rebuttable presumption; the presumption may be rebutted. I further charge you that a person shall not be presumed to act with criminal intention, but the triers of the facts may find such intention upon consideration of the words, conduct, demeanor, and all other circumstances connected with the acts for which the accused has been prosecuted. The burden has always, it has always rested, and continues to rest upon the State to prove the act alleged to be criminal is in fact a criminal act beyond a reasonable doubt.[11]

The charge on implied malice was not impermissibly burden-shifting. *Collins v. Francis*, 728 F.2d 1322, 1330 (11th Cir. 1984).

 As to the charge on the presumption of intent, the law in this circuit on this

issue is unsettled. *See Patterson v. Austin*, 728 F.2d 1389, 1395 (11th Cir.1984); *McCleskey*, 580 F.Supp. at 386–387. The *Patterson* decision, however, provides some guidelines:

> *Sandstrom*-type issues cannot be decided by the application of a rigid and predetermined list of criteria, in which the presence or absence of a particular phrase must inevitably be dispositive of whether a given instruction is to be sanctioned or condemned. Rather, the relevant phases [sic] employed by the trial court must be viewed in the context of the overall charge; consequently, 'Even were the charge in this case identical to that given in *Sandstrom*, the latter case would not necessarily compel reversal here....' *Lamb v. Jernigan*, 683 F.2d 1332, 1339 (11th Cir.1982) ... Subtle differences in the length, phraseology and organization of the overall charge can render the identical remark burden-shifting in one instance but not in another.

*Patterson*, 728 F.2d at 1395. In the present case the trial court repeatedly instructed the jury that the burden of proof at all times rested upon the state. Furthermore, the trial court instructed the jury that no irrebuttable presumption weighed against petitioner. The jury instructions were not impermissibly burden-shifting on the element of intent. *Drake v. Francis*, 727 F.2d 990, *reh'g en banc granted*, at p. 1003 (11th Cir.1984); *Tucker v. Francis*, 723 F.2d 1504, *reh'g en banc granted* at p. 1518 (11th Cir.1984); *Corn v. Zant*, 708 F.2d 549 (11th Cir.1983).

### Prosecutorial Misconduct

As part of his claim of ineffective assistance of counsel, petitioner asserted that his trial counsel was ineffective because he should have objected to the closing argument of the state during the penalty phase. Specifically, petitioner claimed that his defense counsel should have objected to the prosecutor's urging of the imposition of the death sentence to deter other killings of

---

11. Trial Transcript at 1118–1119.

law enforcement officers because the trial court had not permitted defense counsel to put an expert witness on the stand who was prepared to testify that the death penalty does not deter crimes.

As noted already, the Court has rejected petitioner's claim of ineffective assistance. Furthermore, trial counsel did object to the deterrence argument, much to the district attorney's displeasure:

"[DEFENSE COUNSEL]: May it please the Court, now, I'd like to have a hearing outside the jury.

"[DISTRICT ATTORNEY]: No, sir—no, sir, I've got a right to argue this case, and I have a right to argue this case without being disrupted. And I would respectfully insist upon that right.

"[DEFENSE COUNSEL]: Your Honor, he's not arguing the evidence in the case.

"THE COURT: Well, I restrict the district attorney to argue the evidence that's in the case and the reasonable deductions therefrom, and he will follow those restrictions that I place on him, and the jury will disregard any remarks or any statements from either counsel that's not supported by evidence in the case. Proceed, Mr. District Attorney.[12]

Defense counsel acted to protect his client's interests and obtained an instruction from the trial court.

Historically, Georgia law has allowed the prosecution wide leeway on closing argument. *Conner v. State,* 251 Ga. 113, 303 S.E.2d 266, *cert. denied,* —— U.S. ——, 104 S.Ct. 518, 78 L.Ed.2d 704 (1983). Petitioner's trial took place in 1980. Since that time, the federal courts have begun articulating limits beyond which prosecutors should not go in closing argument. *See, e.g., Hance v. Zant,* 696 F.2d 940, 950–953 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). Even assuming that the prosecutor's closing argument at the penalty phase in this case was improper, I am unwilling to hold that trial counsel was ineffective because he did not anticipate the develop-

ment of federal habeas law and therefore did not object sooner or more often during the closing argument. Counsel's performance is not measured against what hindsight makes clear would have been ideal; rather, his performance is judged in the context of the trial and against a standard of reasonableness. *Ford v. Strickland,* 696 F.2d 804, 820 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

After I ruled at the hearing that petitioner did not receive ineffective assistance, petitioner asserted as an independent ground for habeas relief the claim that the prosecutor's closing argument at the penalty stage diverted the jury's attention to impermissible considerations. An independent claim of prosecutorial misconduct was not raised at the state level. Nevertheless, implicit in an assertion that counsel was ineffective because he did not properly object to the prosecutor's closing argument is the assertion that the closing argument was improper. Furthermore, to require petitioner to venture once again to state court to present an independent claim of prosecutorial misconduct would be to require an exercise in futility in light of the state habeas court's reaction when petitioner earlier returned there after a dismissal from this Court.

The Court of Appeals has set forth the standard for determining whether or not petitioner is entitled to habeas relief because of the prosecutor's comments:

In order to prevail on this claim, petitioner must show that the prosecutor's actions were so egregious as to render the trial fundamentally unfair. *Hance v. Zant,* 696 F.2d 940, 950 (11th Cir.1983). We must evaluate the effect of the prosecutor's remarks by considering the totality of the circumstances, *id.* recognizing that with a person's life at stake, a prosecutor should not play on the passions of the jury. *Id.* at 951.

*Moore v. Zant,* 722 F.2d 640, 648 (11th Cir.1983), *reh'g en banc granted,* No. 82–

---

**12.** Trial Transcript at 1207.

8683 (11th Cir. Mar. 15, 1984). The appellate court has also provided criteria for evaluating prosecutorial remarks:

> Several factors should be considered in evaluating prosecutorial misconduct in a habeas case: (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; [and] (3) whether they were deliberately or accidentally placed before the jury....

*Hance*, 696 F.2d at 950 n. 7. After considering the totality of circumstances, I find and conclude that the prosecutor's remarks did not render the sentencing phase of the trial fundamentally unfair.

 The district attorney told the jury that after eight years as a prosecutor he wondered with frustration when people were going to have the courage to defend themselves with the fair and just administration of the death penalty.[13] Obviously the district attorney thought the case appropriate for the death penalty or he would not have sought it. The prosecutor, however, did not tell the jury that in all his time as district attorney did he but seldom seek the death penalty and that in his expert opinion, the Stephens case was one of a few cases where the death penalty was appropriate. *Cf., Tucker v. Zant*, 724 F.2d at 889; *Hance*, 696 F.2d at 951–952.

 The district attorney stated that the victim had been a father and husband who was a law enforcement officer killed while trying to do his job.[14] The district attorney asked the jury to impose the death penalty out of fairness to the victim's widow and children and the people of the State.[15] The evidence had revealed that the victim had been a father and husband and law enforcement officer murdered in the line of duty. "Prosecutors may discuss facts which are in evidence...." *Brooks v. Francis*, 716 F.2d 780, 789 (1983), *reh'g*

*en banc granted*, 728 F.2d 1358 (11th Cir. 1984). "*Hance* did not prohibit prosecutors from arousing the emotions of the jury with statements that are supported by the evidence and relate to issues of an inherently emotional nature that are crucial to the jury's sentencing decision." *Tucker v. Zant*, 724 F.2d at 888. No doubt petitioner did not want the jury reminded that the victim was a flesh and blood public servant with a wife and children, but he was. As a result of petitioner's crime, Mrs. Stephens became a widow and her children were left without a father. Furthermore, the district attorney could appropriately ask the jury to punish Stephens with death for the crime that he had committed against the victim's family and society. *See Collins v. Francis*, 728 F.2d at 1339.

 The prosecutor argued that the jury should not be swayed by "sickly sentimentality", an emotion he identified as distinct from "true mercy."[16] He did not, however, attribute his argument to any court. *Cf., Drake v. Francis*, 727 F.2d at 995–996. The argument was permissible. *Id.*

 Throughout the argument, the district attorney asked the jury to impose the death penalty so as to deter the petitioner and others from again killing a law enforcement officer.[17] The district attorney was within constitutional boundaries to argue the need for a deterrent sentence. *Collins*, 728 F.2d at 1340–1341. Somewhat troubling is the prosecutor's reference to the death penalty in other nations such as Great Britain; the prosecutor told the jury that Great Britain had retained the option of imposing the death penalty for persons found guilty of murdering law enforcement officers.[18] Nevertheless, petitioner has submitted no evidence to indicate that the remark was deliberately made to mislead the jury, and an isolated reference to the

---

**13.** Trial Transcript at 1206.

**14.** *Id.* at 1198–99.

**15.** *Id.* at 1201–1202.

**16.** Trial Transcript at 1205.

**17.** *See, e.g.,* Trial Transcript at 1199, 1203, 1208.

**18.** *Id.* at 1203.

death penalty in other nations, even if inaccurate, is insufficient to support a conclusion that the sentencing phase of the trial was fundamentally unfair, especially in light of the trial court's instruction to the jury to consider only the evidence.

■ The prosecutor reminded the jury that they had the responsibility for sentencing.[19] "It is not improper to remind the jury of its solemn obligation, of its awesome responsibility, or of the importance of the task at hand." *Brooks*, 716 F.2d at 789.

My experience as a lawyer and as a judge has led me to believe that jurors are aware of their duty to apply the law to the facts and that they take their duty seriously. Jurors, however, do not leave their emotions on the courthouse steps. Although the jurors in this case were no doubt influenced and guided in part by their emotions, nothing in the record indicates that they abandoned rational thought in an emotional frenzy devoid of reason. The prosecutor's remarks did not mislead the jury or prejudice the accused so as to render the sentencing phase fundamentally unfair.

### Trial Court Misconduct

■ Petitioner claims that "the trial judge improperly and repeatedly interjected into the presentation of the case in a manner which exhibited his bias against the defendant and in favor of the prosecution."[20] In his brief, petitioner described what he considers "the most notable instance of misconduct":

> While the petitioner was testifying during the guilt/innocence phase of the trial, the court ordered him to pick up the rifle and demonstrate to the jury how he was carrying it at the time that he said the decedent began shooting at him. The effect of this request was highly prejudicial because several jurors actually

ducked in their seats as petitioner complied with the court's request.[21]

The allegation is without factual support. The record does not indicate the jurors' reactions when petitioner picked up the rifle.[22] Petitioner made no offer of proof at the evidentiary hearing to support the allegation.

Petitioner cites other examples of trial court misconduct. Having reviewed the transcript, the Court concludes that the trial judge's remarks did not deprive petitioner of a fair trial and do not require habeas relief. *Allen v. Montgomery*, 728 F.2d 1409, 1415–1416 (11th Cir.1984).

### Evidence at the Penalty Stage

■ Petitioner argues that the trial court violated his due process rights when it refused to permit petitioner to call a witness, a professor of criminal justice and sociology, who was to testify about studies that concluded that capital punishment has no deterrent effect on criminal behavior. The evidence did not concern any aspect of petitioner's character, record, or any of the circumstances of the offense. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Even at the penalty stage the courts may exclude irrelevant evidence. *See, e.g., Young v. Zant*, 727 F.2d 1489, 1493 (11th Cir.1984). The exclusion of the evidence on the deterrence effect of the death penalty does not entitle petitioner to habeas relief.

■ Petitioner argues that evidence of his prior convictions should not have been admitted at the penalty stage of the trial. Evidence of petitioner's prior record was admissible. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2748, 77 L.Ed.2d 235 (1983).

### Jury Charge on Mitigating Circumstances

■ Petitioner argues that the trial court's charge on mitigating circumstances was inadequate. The trial court defined

---

**19.** *Id.* at 1204.

**20.** Memorandum of Law in Support of Petition for Habeas Corpus at 87.

**21.** Memorandum of Law in Support of Petition for Habeas Corpus at 87.

**22.** Trial Transcript at 1029–1030.

and explained the function of mitigating circumstances:

Now, Members of the Jury, if you find beyond a reasonable doubt that the State has proven the existence of one or more of the aggravating circumstances given to you in this charge, you nonetheless are not required to recommend that the accused be put to death. You shall consider any mitigating circumstances.

Mitigating circumstances are those circumstances which in fairness and mercy shall be considered by you in fixing punishment. You may, if you see fit, and this is a matter entirely within your discretion, provide for a life sentence for the accused based upon any mitigating circumstance or reason satisfactory to you, or without any reason, if you see fit to do so. You may recommend the life imprisonment even though you have found one or more of the aggravating circumstances given to you in this charge to have existed beyond a reasonable doubt.[23]

Petitioner's argument is without merit. *Tucker v. Zant,* 724 F.2d at 891–892.

In conclusion, petitioner is not entitled to habeas relief. Accordingly, the Court orders the stay of execution DISSOLVED and orders the case DISMISSED.

---

**23.** Trial Transcript at 1224.